J-A09019-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1356 WDA 2025 |

Appeal from the Dispositional Order Entered September 22, 2025
In the Court of Common Pleas of Allegheny County Juvenile Division at
No(s): CP-02-JV-0000540-2025

BEFORE: NICHOLS, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED: May 5, 2026**

A.M. appeals from the dispositional order imposed following his adjudication of delinquency for possession with intent to deliver, firearms not to be carried without a license, possession of firearm by a minor, possession of instrument of crime, possession of a controlled substance, and possession of drug paraphernalia.[1] He challenges the sufficiency of the evidence and the court's finding that he required treatment, rehabilitation, and supervision. We affirm.

At A.M.'s September 2, 2025 delinquency hearing, the Commonwealth presented the following evidence. Detective J. Dean from the City of Pittsburgh Zone 3 police testified that at approximately 12:30 A.M. on May 3, 2025, he was on patrol in the Knoxville neighborhood in Pittsburgh with Officer Dalton

---

[1] 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. §§ 6106(a)(1), 6110.1, 907(a), 35 P.S. § 780-113(a)(16), (32), respectively.

Dubrosky and Officer Pokora. N.T. Adjudicatory Hearing, 9/2/25, at 8-9. Detective Dean stated that they were patrolling that area due to it being a high crime area. *Id.* at 9. While on patrol, they observed a vehicle committing several traffic violations, including failing to use a turn signal and failing to stop at an intersection. *Id.* at 10. The officers effectuated a traffic stop and observed that A.M. was the driver and sole occupant of the vehicle. *Id.* at 10-11. Detective Dean testified that as soon as he approached the vehicle, he smelled an "[o]verwhelming" odor of burnt marijuana coming out of the vehicle. *Id.* at 12. Detective Dean asked A.M. if he had been smoking or if there was any marijuana inside the vehicle. *Id.* at 13. A.M. replied that "him and his friends were smoking before, earlier. And then he kind of quickly changed his story and said he doesn't smoke." *Id.* Detective Dean then asked A.M. for consent to search the vehicle and A.M. gave consent. *Id.* at 14. Detective Dean stated that A.M. was cooperative and made no furtive movements. *Id.* at 23-25. Detective Dean then testified as to what he observed:

> A. [DETECTIVE DEAN] At that time, I approached the driver's side of the vehicle and looked directly underneath the driver's seat and I noticed there was a small fresh leaf of marijuana. And then once I came from underneath the seat, I immediately noticed there was a firearm underneath the steering column where you adjust the steering column. There was a firearm right there.
>
> Q. [THE COMMONWEALTH] That's in the steering wheel?
>
> A. Correct. Underneath the steering wheel.

Q. And typically people would have their legs on both sides of the steering column?

A. Correct.

Q. And I want to be very specific about this. It was protruding from the steering column?

A. Yes. Like, underneath where you adjust the steering, there is like a little gap. It was in between that.

Q. Was the handle protruding from the steering column?

A. Yes.

***

Q. I just want to be very clear. When you say the steering column, there is a steering wheel?

A. Correct.

Q. And the column connects the steering wheel to the car?

A. Yes. So, essentially, if you are looking at the steering wheel, you know the steering wheel where you turn the key on or push it to start, it is going to be underneath where you have, like, the lever where you can adjust the steering wheel up close to you, up and down. There is like a little space between it. If the steering wheel was all the way up, you could put something in there.

Q. And was the steering wheel all the way up?

A. I'm not sure.

Q. But the defendant, [A.M.], he was the sole occupant of the vehicle and the driver of the vehicle?

A. Correct.

*Id.* at 14-15, 20-21.

Detective Dean testified that the officers then retrieved the firearm, detained A.M., and obtained a search warrant for the vehicle. *Id.* at 19.

- 3 -

On cross-examination, Detective Dean stated that the firearm was not in plain view and he had to bend down and shine his flashlight to see the gun. *Id.* at 31-32. He further stated that no contraband was found on A.M.'s person and the gun was not tested for DNA or fingerprints. *Id.* at 34.

Officer Dubrosky testified that when he approached the driver's side of A.M.'s vehicle, he smelled a "a strong odor of burnt marijuana[.]" *Id.* at 38. A.M. indicated to Officer Dubrosky that the vehicle was not registered to him, but he was primary person who drove the vehicle. *Id.* at 39. Officer Dubrosky testified that after he informed A.M. that they had found a firearm, A.M. stated, "'Oh yeah', and then paused and said, 'It's not mine,' in a very calm manner." *Id.* at 38. A.M. told Officer Dubrosky that his brother had a gun license. *Id.* at 48-49.

Officer Dubrosky further testified that a search warrant was obtained, and during the search of the vehicle, he located a black backpack on the rear passenger floorboard. *Id.* at 40. The backpack contained two large mason jars with marijuana inside, 11 Ziploc bags containing marijuana, several unused empty Ziploc bags, and a black digital scale. *Id.* Officer Dubrosky confirmed that A.M. had no contraband on his person and there were no indicia in the backpack that A.M. owned it. *Id.* at 45, 50. After Officer Dubrosky concluded his testimony, the Commonwealth rested.

The defense called A.M.'s brother ("Brother") who testified that he was unsure if the vehicle was owned by his stepmother or A.M., but A.M. was the primary person who used the car. *Id.* at 56. Brother stated that on the day in

question, he asked to borrow the car to go to work from 3:00 to 11:00 P.M. *Id.* at 55. Brother said that A.M. asked Brother to return the car to the house after his shift because A.M. had to bring his girlfriend home. *Id.* at 55-56. Brother testified that as soon as he got home from work, he gave the car to A.M. and "[he] got out and [A.M.] got in." *Id.* at 56-57. Brother went into the house and took a shower. *Id.* at 57. Brother's sister then called and informed Brother that A.M. was in jail because a gun was found in the car. *Id.* Brother testified that the gun was his and he had forgotten he had left it in the car. *Id.* He stated that he left the gun in the console under the steering wheel and that is where he usually stored it. *Id.* at 57, 76-77. He had not told A.M. that he had left his gun in the car. *Id.* at 57. Brother said that, to his knowledge, A.M. did not know the gun was in the car. *Id.* at 68. Brother testified that he legally owned the gun and had a license to carry. *Id.* at 58-59. Brother presented his gun license and proof of purchase to the court. *Id.* at 59, 65. Brother testified that a couple of days after A.M. was arrested, he went to the police station to report that the gun belonged to him and not to A.M. *Id.* at 68-70. He stated that the officer at the police station told him that the matter needed to be handled in court. *Id.* at 70. Brother testified that he had no knowledge about the marijuana found in the car. *Id.* at 75.

In rebuttal, the Commonwealth called Officer Dubrosky. Officer Dubrosky testified that A.M. told him he was returning home after dropping his girlfriend off when he was pulled over and they were at the movies prior to that. *Id.* at 89. Officer Dubrosky observed that there was a movie ticket in

the vehicle. *Id.* Officer Dubrosky testified that at no time during his interview with A.M. did A.M. tell him anything about getting the car from Brother. *Id.* at 89, 91.

At the conclusion of the hearing, the court adjudicated A.M. delinquent. *Id.* at 103. Disposition was deferred and A.M. was detained. *Id.* at 108-09.

On September 22, 2025, a hearing was held regarding A.M.'s need for treatment, rehabilitation, and supervision and disposition of the adjudication of delinquency. A.M.'s probation officer, A.M.'s mother, and A.M. testified at the hearing. The court summarized the testimony of A.M.'s probation officer as follows:

> The [c]ourt heard testimony that A.M. is on juvenile probation, and that he was in detention from May 3 to May 12, 2025. He had no negative reports during that time. He was released from detention on May 12, 2025 and had been on supervision since that time. He was placed on [electronic home monitoring ("EHM")] from May 12 through [S]eptember 2, 2025[.] He had no violations during that time. He graduated from the Woodland Hills high school and was on the [high] honor roll. He works as a server at a local restaurant. He is scheduled to begin school on October 2, 2025, to earn a degree in aviation mechanics at Pittsburgh Institute of Aeronautics, PIA. A.M. was evaluated for drug and alcohol issues and was deemed to not have a substance abuse disorder. A.M. does not have any mental health conditions.

Rule 1925(a) Opinion, filed 12/3/25, at 2.

The court next heard from A.M.'s mother and found that she was "extremely supportive both emotionally and educationally." *Id.*

A.M. read a letter that he wrote to the court. N.T. Hearing, 9/22/25, at 38. He stated that he had dreams of receiving a higher education and was eager to start aviation mechanic school. *Id.* A.M. said that while he was in detention, he "prayed a lot" and "rethought many things." *Id.* at 39. He stated that the court would not regret releasing him because he "will reach for the stars." *Id.*

At the conclusion of the hearing, the court found that A.M. was in need of treatment, rehabilitation, and supervision and placed him on suspended probation. It further ordered that A.M. be placed on EHM for 30 days, pay fees and costs, attend aviation mechanic school, and complete 300 hours of community service. This appeal followed.[2]

A.M. raises the following issues:

> I. Whether the evidence was insufficient to sustain A.M.'s adjudications of delinquency for Possession With Intent to Deliver; Firearms Not to be Carried Without a License; Possession of Firearm by a Minor; Possession of an Instrument of Crime; Possession of a Controlled Substance; and Possession of Drug Paraphernalia, where the Commonwealth failed to prove, beyond a reasonable doubt, that A.M. had actual or constructive possession of the subject firearm, marijuana and paraphernalia?
>
> II. Whether the Adjudication Court erred and abused its discretion in determining that A.M. needed treatment, rehabilitation and supervision based wholly upon its finding that that A.M. committed acts that constituted felonies without considering the uncontradicted evidence that A.M.

---

[2] "In juvenile proceedings, the final order from which a direct appeal may be taken is the order of disposition, entered after the juvenile is adjudicated delinquent." *In Interest of P.S.*, 158 A.3d 643, 649 (Pa.Super. 2017) (citation and brackets omitted).

was not in need of treatment, rehabilitation and supervision?

A.M.'s Br. at 7 (suggested answers omitted).

A.M. first argues that the Commonwealth's evidence was insufficient to sustain his adjudication of delinquency because the Commonwealth failed to prove that he had actual or constructive possession of the firearm, marijuana, and drug paraphernalia. *Id.* at 21. He maintains that his adjudication of delinquency "was premised on the mere presence of the firearm and other contraband" in the vehicle. *Id.* at 25. A.M. points out that no firearm or contraband was found on his person and argues that "the Commonwealth failed to establish that [he] had knowledge of, control of, or the intent to control the subject firearm and contraband." *Id.* at 21.

As to the firearm, A.M. highlights that the firearm was not in plain view and Detective Dean had to bend down and shine his flashlight to find it. *Id.* at 26. A.M. argues that when he was questioned about the firearm, he told Officer Dubrosky that it was not his, and that his brother had a license to carry, and his brother, in fact, testified that he purchased the subject firearm. *Id.* In A.M.'s view, "the location of the firearm alone was not sufficient to prove [his] prior knowledge of its existence in the vehicle." *Id.* He further argues that the evidence failed to show that he ever handled the firearm since the firearm was not submitted for DNA or fingerprint testing. *Id.* at 27.

As to the contraband, A.M. argues that there was no evidence of contraband on his person and there was no indication that marijuana had been ingested in the vehicle. *Id.* He further asserts the backpack containing the

contraband was found on the rear passenger floorboard and "there were no indicia that A.M. owned or possessed the bag." **Id.** A.M. concludes that the evidence was insufficient because "the Commonwealth's sole evidence regarding the marijuana and paraphernalia was based upon its presence in the vehicle, *i.e.* its location and proximity." **Id.**

"When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime beyond a reasonable doubt." **In Interest of P.S.**, 158 A.3d at 650 (citation omitted). Our standard of review for a challenge to the sufficiency of the evidence is well-settled:

> [W]e must review the entire record and view the evidence in the light most favorable to the Commonwealth. In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.

**Int. of N.A.D.**, 205 A.3d 1237, 1239-40 (Pa.Super. 2019) (citation omitted) (alteration in original).

"Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth." **In Interest of P.S.**, 158 A.3d at 650 (citation omitted). "The hearing judge, as sole assessor

of credibility, may believe all, part or none of the evidence presented." *In re Love*, 646 A.2d 1233, 1237 (Pa.Super. 1994). "The hearing judge's findings will not be reversed by this Court unless it appears that he has clearly abused his discretion or committed an error of law." *Id.*

All of A.M.'s offenses require possession as an element. Possession can be established "by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa.Super. 2018) (citation omitted). "Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction." *Id.* Constructive possession exists where the defendant has "the power to control the contraband and the intent to exercise that control." *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa.Super. 2013) (citation omitted). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not." *Commonwealth v. McClellan*, 178 A.3d 874, 878 (Pa.Super. 2018).

The Commonwealth may prove constructive possession by the totality of the circumstances. *Hopkins*, 67 A.3d at 820. "[A] defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items." *Parrish*, 191 A.3d at 37. "Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession." *Id.*

When a firearm or other contraband is located inside of a vehicle, the fact that an individual was not the owner of the vehicle, or the possibility that the contraband may have been primarily possessed by someone else, does not render the evidence insufficient as a matter of law to prove a defendant's constructive possession of the contraband. **Commonwealth v. Wright**, 255 A.3d 542, 554 (Pa.Super. 2021).

Here, the court found that the Commonwealth presented sufficient evidence that A.M. constructively possessed the firearm and contraband. It explained that "[t]here is no question that [A.M.] was the main user of this vehicle" and "[a]ll items that were indicated, the marijuana, the firearm, all were found in the vehicle as well." N.T. Adjudicatory Hearing at 103. Regarding Brother's testimony, the court stated, "I'm not totally convinced at all in regard to his brother's account of things." **Id.**

Based on our review of the record and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find no error in the court's conclusion. The evidence showed that A.M. was the sole occupant of the vehicle at the time of the lawful traffic stop and he was the primary user of the car. The firearm was located directly under the steering wheel, and its handle was protruding out within A.M.'s reach. When the troopers informed A.M. that a firearm was found in his car, he expressed no surprise and told them his brother had a permit to carry. Additionally, the contraband was found on the back seat floor in the vehicle. Again, A.M. was the vehicle's sole occupant, and the officers immediately smelled burnt marijuana when they

approached the vehicle. Further, the Commonwealth was not required to establish any DNA links of the firearm to A.M. The court was permitted to credit the testimonial and circumstantial evidence linking A.M. to the firearm. The court evidently did not credit Brother's account of the events. A review of the totality of the evidence leads to the conclusion that it was sufficient to prove that A.M. had the intent and ability to control the firearm and contraband. The evidence was thus sufficient to sustain A.M.'s adjudication of delinquency.

A.M. next argues that the court abused its discretion in its determining that he required treatment, rehabilitation, and supervision. He maintains that the court "relied exclusively on its findings that A.M. committed the delinquent acts and the severity of those offenses without regard to whether he actually required treatment, rehabilitation and supervision." A.M.'s Br. at 21. In his view, the court "failed to place its reasons for finding that A.M. required treatment, rehabilitation and supervision on the record" and instead relied "wholly on the offenses committed and its assessment of other individuals who appeared before it[.]" *Id.* at 30, 31.

A.M. recognizes that when the offenses at issue are felonies, like here, the Juvenile Act presumes the need for treatment, rehabilitation, and supervision, but argues that "the presumption is not irrebuttable." *Id.* at 32. He asserts that the following testimony by his probation officer contradicted any presumption: there was no negative reports or violations by A.M., A.M. had been cooperative and communicated with juvenile probation, all of A.M.'s

drug screens were negative, A.M. graduated from high school with high honors and planned to attend aviation mechanic school, A.M. worked at a restaurant, A.M. had no mental health issues, A.M. never missed court, and A.M. had a positive relationship with his mother. *Id.* at 32-33.

"Our standard of review of dispositional orders in juvenile proceedings is well settled. The Juvenile Act grants broad discretion to juvenile courts when determining an appropriate disposition." *Interest of N.M.*, 311 A.3d 1149, 1152 (Pa.Super. 2024). "We will not disturb the juvenile court's disposition absent a manifest abuse of discretion." *Id.*

One of the stated purposes of the Juvenile Act is

> [c]onsistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

42 Pa.C.S.A. § 6301(b)(2).

"[T]he Juvenile Act requires a juvenile court to find that a child has committed a delinquent act *and* that the child is in need of treatment, supervision, or rehabilitation, before the court may enter an adjudication of delinquency." *Commonwealth v. M.W.*, 39 A.3d 958, 964 (Pa. 2012) (emphasis in original). If "the court concludes the juvenile committed the delinquent acts alleged in the delinquency petition, it must enter such finding on the record, specifying the particular offense, including the grading and counts thereof, which the juvenile is found to have committed." *Id.* at 963.

"Upon finding the juvenile committed the delinquent acts ascribed to him, the court must then determine whether the juvenile is in need of treatment, supervision or rehabilitation[.]" *Id.* Prior to entering a dispositional order, "the court shall state its disposition and the reasons for its disposition on the record in open court, together with the goals, terms and conditions of that disposition." 42 Pa.C.S.A. § 6352(c).

Here, at the conclusion of the hearing, the court stated:

> First of all, [A.M.] was found to have committed the following acts: One, possession with intent to manufacture or deliver, a firearm not to be carried without a license, possession of a firearm, possessing instruments of crime, possession of a controlled substance, possession of drug paraphernalia, and also a traffic violation as well. Actually two traffic violations as well. That's the first thing.
>
> The second (inaudible), which I agreed to have a hearing on here today, is [sic] regards (inaudible) is he in need of further court supervision or treatment. I guess I should have indicated that at the hearing, well, there is no question that with these charges being found against him, he is in need of further court supervision or treatment. Not a question. But let's just go over it just in case.
>
> First of all, it was argued that he is not a -- that he is a rare individual. I do not find – I've been doing this for 20 years now. It's not rare that you have an intelligent young man, respectful, supported, not involved, not a drug addict or any of these things, but still have these issues, still coming in the courtroom. That's a problem. All of those individuals need further court supervision and/or treatment, as does [A.M.] here today.
>
> I haven't heard one explanation that indicates why those things that he was charged with, why those things were there. Why it happened. Not one. Not even today. Didn't hear it today.

So it's amazing how not all juveniles, but most of them, when they are under court supervision, they walk the straight and narrow.

And whenever they go into detention, they are not a problem. They are respectful, doing all the right things. Not all of them, but the majority of them do. So that doesn't sway this [c]ourt one way or the other at all. I would expect anyone with any sense would do those things because he got court supervision, you got people there, you're in detention, you have to do those things. That's not enough. It's the issue that happened before that.

He already has a lot of support around him, particularly his mother. I commend her and her support of him as well, but still, he still had these charges, they're still there, and they were found here today as well as at the last hearing as well.

So with the acts being supported and founded by this [c]ourt, as well as him being in need of further supervision and/or treatment, he has been found again here today to be delinquent of the charges that have been put forth.

N.T. Hearing at 46-48.

We discern no abuse of discretion in the court's finding that A.M. was in need of treatment, supervision and rehabilitation, and the record supports the court's findings. The court heard arguments from both counsel, as well as the testimony of A.M.'s probation officer and mother. A.M. also read a letter to the court. The court was permitted to weigh the testimony as it deemed fit. *See In re L.A.*, 853 A.2d 388, 391 (Pa.Super. 2004) (stating in a juvenile proceeding, "[t]he weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder"). The court further considered the seriousness of the crime and the protection of the public. Because we discern no manifest abuse of the court's discretion, we affirm the court's dispositional order.

- 15 -

Order affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  5/5/2026